# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

VELMON BRASWELL,
     Plaintiff,

     v.

VICTOR CORLEY,[1] et al.,
     Defendants.

No. 3:11-cv-1565 (MPS)

## MEMORANDUM OF DECISION

### I.       Introduction

Plaintiff Velmon Braswell ("Mr. Braswell") brings this case against twelve Connecticut judicial marshals (collectively, the "Defendants") who he claims used excessive force against him on three occasions while he was a pretrial detainee at the Superior Court building in Stamford. After thoroughly reviewing the voluminous materials submitted by the parties,[2] I GRANT summary judgment as to the events on April 28, 2010 because a reasonable juror would have to find that the marshals involved applied force in a good-faith effort to maintain and restore discipline, not maliciously and sadistically to cause harm. I DENY summary judgment as to the July 20, 2010 and July 27, 2010 incidents because there is a genuine issue of material fact as to whether the marshals involved used excessive force and because, on this record, those marshals are not entitled to quasi-judicial and/or qualified immunity. In addition, I GRANT summary judgment as to defendants Norberto Caribe, Mark Cornish, and Edward Martinez

---

[1] The caption of the Amended Complaint states "Victor Conley," but the parties agree that the defendant's correct name is "Victor Corley." Although Mr. Braswell has not filed a motion to amend this error, I will refer to defendant Corley by his correct name.

[2] Both parties have submitted a motion to amend/correct their summary judgment briefing to include evidence they mistakenly omitted from the record. (*See* Defs.' Motion to Amend/Correct (ECF No. 59), Pl.'s Motion to Amend/Correct (ECF No. 71).) Because neither party has objected to the admission of these additional materials, and because I have considered these materials in evaluating Defendants' Motion for Summary Judgment, I GRANT both motions to amend/correct.

because the record does not support their involvement in any of the alleged instances of excessive force. With regard to the portions of the case to which I deny summary judgment, I emphasize that this ruling should not be taken as any indication as to how I think Mr. Braswell is likely to fare at trial in what appears, at best, to be a challenging case for him. This ruling is only a finding that it would violate Rule 56 of the Federal Rules of Civil Procedure to deny Mr. Braswell a trial with respect to certain portions of the case.

## II.  Facts

Mr. Braswell has alleged three incidents of excessive force. For purposes of this motion, all facts are construed in the light most favorable to Mr. Braswell and are undisputed, unless otherwise noted.

### A.  April 28, 2010

Mr. Braswell, while still a pretrial detainee, appeared before the Honorable William Wenzel in Stamford Superior Court for jury selection in his criminal case. (Am. Compl. ¶ 20; Defs.' SOF, ¶ 3.) The hearing started without Mr. Braswell. Mr. Braswell's public defender explained to Judge Wenzel that Mr. Braswell wanted to proceed *pro se* and "he's informed me that if the Court would were [sic] to force him to come out and proceed forward with this trial, that he would be disruptive throughout the process." (Defs.' MSJ, Ex. 6, Tr. April 28, 2010, 1:8-13.) Judge Wenzel ordered Mr. Braswell to join the hearing and asked him to present his motion to proceed *pro se*. (*Id*. 1:14-24.) After listening to Mr. Braswell's arguments, Judge Wenzel denied the motion, stating, in relevant part:

> COURT:　　But if you tell me you're going to be disruptive, one, that's not going to help you in front of the people that are going to decide your case. Number two, at some point I'm going to have you removed from the courtroom, and that's not going to help your case at all.

2

(*Id.* 22:9-14.) Mr. Braswell then expressed his desire to leave the courtroom as a form of protest

and engaged in a back-and-forth exchange in which he repeatedly interrupted Judge Wenzel and

refused to comply with court orders:

| | |
|---|---|
| BRASWELL: | I understand that, Your Honor. I understand that, but with all due respect, I'm going to ask that the marshals just take me out of the courtroom now. |
| COURT: | Okay. Well, they -- |
| BRASWELL: | I disagree -- |
| COURT: | -- pretty much look to me -- |
| BRASWELL: | -- with basically everything. |
| COURT: | -- for guidance; not you. |
| BRASWELL: | I appreciate it. |
| COURT: | Okay? So, we're going to start jury selection. If you choose to become disruptive, I'll have you removed from the court. |
| BRASWELL: | I wanna leave now, sir. Please. I'd like to move now. |
| COURT: | Well -- |
| BRASWELL: | I really do. |
| COURT: | -- you understand -- |
| BRASWELL: | I mean, that's my right to not stay here, if I don't have to stay here, sir. |
| COURT: | You understand you have the right -- |
| BRASWELL: | I'm asking -- |
| COURT: | Don't interrupt me, sir. |
| BRASWELL: | I'm asking out of protest, sir. |
| COURT: | Sir, don't interrupt. |
| BRASWELL: | Sir, I'd take the contempt of Court, sir. Out of respect, I would take -- the Court to respect my rights. |
| COURT: | Well, you let me -- |
| BRASWELL: | Sir, I really need to leave the courtroom, out of respect. I respect you, Your Honor. |
| COURT: | *Hold him right there, marshal. Okay? Sir, I choose when you get to leave the courtroom. Okay?* |
| . . . | |
| COURT: | I don't want -- |
| BRASWELL: | *I'm here to walk away from something that's not right.* And I feel that I'm in protest of it. I'm in protest of this Court now, because of the racism I'm facing now. I have said it all along, sir. |
| COURT: | Let me -- |
| BRASWELL: | I've said it all along, sir. I'm really not hearing you. I'm really not hearing you. |
| . . . | |
| BRASWELL: | *No. I'm leaving this courtroom.* Let you proceed without me, sir. |
| COURT: | Do you want to give up your – |

| | |
|---|---|
| BRASWELL: | Sir, I haven't give [sic] up that right. I'm giving myself -- relieving myself -- |
| COURT: | *Sit him down right there.* |
| BRASWELL: | *I'm relieving myself --* |
| COURT: | *Sit down and be quiet.* |
| BRASWELL: | Sir -- no, my hips is messed up. And you're -- hurting -- |
| COURT: | Sit down and be quiet. |
| (Cross-talk) | |
| BRASWELL: | I'm asking to remove myself from the courtroom, sir. |
| MARSHAL: | *The Judge just ordered you to sit down.* |
| (Cross-talk) | |
| BRASWELL: | Your Honor, I ask you -- |
| COURT: | *Sit down. Help him down.* |
| BRASWELL: | *No, I'm not.* |
| MARSHAL: | *Yes, you are. Sit down, sir.* |
| BRASWELL: | Watch my hip. |
| (Cross-talk) | |
| BRASWELL: | *I'm not sitting down. I asked to leave the courtroom, sir. I asked to leave the courtroom. I want to go back. Let me –* |
| (Cross-talk) | |
| BRASWELL: | That's the same thing that happened in Stamford Police Station, just like that. And that's why I'm protesting right now. The same thing happened. The racism -- take your hand off me. *And I'm walking --* |
| MARSHAL: | *No, you're not, sir.* |
| BRASWELL: | *I'm walking out of here.* |
| (Cross-talk) | |
| COURT: | Just leave him in place, if he wants to stand. |
| BRASWELL: | I don't want -- *Sir, I want to leave the courtroom, sir.* I don't agree with it. And it's as simple as that. |
| COURT: | Well, you know -- |
| BRASWELL: | You do it without me. Do the trial without me, sir. |
| COURT: | -- you don't have to agree. |
| . . . | |
| COURT: | Sir, I'm -- why don't you just do me show me a little bit of respect here, and let me -- |
| BRASWELL: | Sir, I have. And there's nobody showing me any respect. I've been pushed around. And once you do that to me, it's over with. All right? It's over with. And I'm just -- and I will proceed in Federal -- in the Federal Court on a civil action on this -- in this -- like I'm doing the |
| | Stamford Police, same thing as this. |
| . . . | |
| BRASWELL: | Your Honor, I would like to leave the courtroom, sir. |
| COURT: | Okay. Request is denied until you listen to what I have to say. |
| BRASWELL: | Your Honor, I would like to leave your courtroom, sir. |

COURT:          Sir --
BRASWELL: Your Honor, I would like to leave your courtroom, sir.
COURT:          Do you understand you have the right to be present?
BRASWELL: I understand the fact that this is a racist court. And I understand the
                fact that I'm not gonna sit here and take this. You know. I just got
                man-handled for no reason at all.
COURT:          Marshals --
BRASWELL: My hands are behind my back --
THE COURT:          Take the defendant to the --
BRASWELL: Shackles. Come on man. This is worse that slavery.
COURT:          -- room where he can view the Court proceedings.
BRASWELL: I don't wanna see it. I don't wanna see it. I won't look at the Court
                proceedings. You know? You might as well just take me out of
                here. Let me have my paperwork, please? All right? As simple as
                that.
(WHEREUPON THE DEFENDANT WAS ESCORTED OUT OF THE
COURTROOM)

(*Id*. 22:18-27–28:1-15) (emphasis added). Mr. Braswell alleges that two of the defendants—

Marshals Jason Walker and Peter Ferraro—used excessive force against him during this

exchange. In particular, Mr. Braswell alleges that when he "turned" towards the observation

room, "indicating to the Judge that I was ready to leave," the marshals handcuffed him behind

his back and Marshal Ferraro twisted Mr. Braswell's left wrist while pushing Mr. Braswell's arm

behind his back. (Pl.'s Ex. AA ¶¶ 11-13.) Mr. Braswell claims he felt a sharp pain in his wrist

and arm, heard a popping sound from his wrist, and that Marshal Ferraro would not stop twisting

his wrist even though Mr. Braswell told him it hurt. (*Id*. ¶¶ 14, 15.) Mr. Braswell also alleges that

when Judge Wenzel ordered him to sit, Marshal Ferraro continued twisting his left wrist and

pulling his arm backward and that Mr. Braswell only resisted sitting because of the pain. (*Id*. ¶¶

17, 19.) Mr. Braswell also stated he was wearing leg shackles at all times. (*Id*. ¶ 23.)

Shortly after the marshals escorted Mr. Braswell to the adjoining observation room, he

complained that he had been injured and needed to go the hospital. (*Id*. ¶ 24.) Judge Wenzel said

"to err on the side of caution" the EMS had been notified and Mr. Braswell would be taken to the

emergency room for examination. (Defs.' MSJ, Ex. 6, Tr. April 28, 2010, 31:9-15.) A physician at the Stamford Hospital thereafter diagnosed Mr. Braswell with a wrist sprain. (Defs.' Exs. 11, 13.) The physician also reported that Mr. Braswell had denied feeling a popping sensation or hearing an audible pop, and had no numbness, tingling, pain, or paresthesia to the distal fingertip. (Defs.' Ex. 13.)

### B.  July 20, 2010

Mr. Braswell reappeared at the Stamford Courthouse on July 20, 2010 in connection with his criminal trial. (Pl.'s Ex. AA ¶ 26.) Unidentified marshals placed Mr. Braswell in a holding cell. (*Id*. ¶ 28.) Mr. Braswell wore leg shackles and a soft brace on his left wrist. (*Id*. ¶ 30; Defs.' Ex. 17.) Two of the defendants, Marshals Samuel Rosario and Mark Cornish, arrived at his cell; Marshal Rosario told Mr. Braswell to stand and come to the door for handcuffing. (Defs.' SOF, ¶¶ 65, 66.)

Although the parties dispute what happened next, Mr. Braswell claims that he was wearing a soft brace on his left wrist and told Marshal Rosario, "Could you please watch my left hand? It's really hurting. And could you use two cuffs?" (Pl.'s Ex. A, 73:21-23; Pl.'s Ex. AA ¶ 30.) Marshal Rosario used two handcuffs so Mr. Braswell would have more flexibility but tightened one too tightly, prompting Mr. Braswell to ask Marshal Rosario to loosen the cuff because it was hurting and causing numbness in his arm. (Pl.'s Ex. A, 73:23-25, 74:1-6.) Marshal Rosario told Mr. Braswell to move in the direction of the elevator. (Defs.' SOF, ¶ 17.) When Mr. Braswell refused to move, Marshal Rosario told him "You're good to go" and pushed Mr. Braswell in the small of his back to make him walk. (*Id*. 74:7-8; Defs.' SOF ¶ 73.) Mr. Braswell left the cell and started walking towards the elevator with Marshals Rosario and Cornish behind him. (Defs.' Ex. 17.) He then turned around to face the marshals and walked backwards. (*Id*.)

Marshal Rosario pushed Mr. Braswell in the chest. (*Id*.)

When they arrived at the elevator, Marshal Rosario pushed Mr. Braswell in the chest while the two yelled at each other, and then put his hands on Mr. Braswell's chest and pushed him into the caged portion of the elevator. (*Id*.) Mr. Braswell's left shoulder hit the back of the elevator wall. (*Id*.) Marshal Rosario then placed one of his hands on Mr. Braswell's shoulder and pushed Mr. Braswell against the back wall of the elevator. (*Id*.; Pl.'s Ex. AA ¶¶ 42, 43.) Mr. Braswell claims he fell forward and hit his head on the wall's steel corner with his stomach almost parallel to the floor from the force of the push. (Pl.'s Ex. A, 79:5-13.) He then kicked his left leg out to brace his fall, so that his right knee was on the floor. (*Id*. 86:25, 89:1-13.) The marshals were unable to close the gate door because Mr. Braswell's left leg was out. (*Id*. 88:2-4.) While Mr. Braswell was still on his right knee, Marshal Rosario pulled out a can of mace and threatened to use it. (*Id*. 90:3-6.) Mr. Braswell called Marshal Rosario a coward, and then Marshal Rosario pushed Mr. Braswell's leg back into the caged portion of the gate. (*Id*. 90:20-25.) Marshal Cornish closed the caged door of the elevator while Marshal Rosario continued to yell at Mr. Braswell. (Pl.'s Ex. AA ¶¶ 44, 47.) Mr. Braswell stood and shifted his weight between feet while Marshal Rosario reached for his mace. (*Id*. ¶¶ 48, 49.)

When the elevator door opened, defendants Chief Judicial Marshal Victor Corley and Supervising Judicial Marshal Joseph Suda walked in. (*Id*. ¶¶ 49, 50.) Chief Corley positioned himself between Mr. Braswell and Marshal Rosario and ordered Marshal Rosario to exit the elevator. (*Id*. ¶¶ 51, 52.) Mr. Braswell told Chief Corley that he was injured. (Pl.'s Ex. A, 92:21-23.) Chief Corley said Mr. Braswell had to see Judge Wenzel, and Mr. Braswell was eventually escorted by unknown marshals back to court. (*Id*. 92:24-25, 93:6-11.)

Marshals Rosario and Cornish offer a very different version of events. Marshal Rosario

7

claims that he gently placed handcuffs on Mr. Braswell; that Mr. Braswell responded by aggressively yelling "Watch my hand, watch my fucking hand, you hear me"; that Marshal Rosario only used a "desensitizing touch" to move Mr. Braswell towards the elevator after he would not comply with Marshal Rosario's orders to walk; that Mr. Braswell became very aggressive and continued to yell obscenities at the marshals while pulling away; and that Mr. Braswell tried to kick Marshal Rosario and leave the caged portion of the elevator, requiring Marshal Rosario to push Mr. Braswell back into the cage. (Defs.' MSJ, Ex. 16.)

Defendants have submitted a videotape of the events, and Mr. Braswell does not dispute its authenticity. (*See* Defs.' Ex. 17.) As explained in further detail below, the videotape, due to its lack of audio and limited angles, neither fully corroborates nor completely refutes either party's account.

Nonetheless, it is undisputed that when Mr. Braswell was escorted into the courtroom after the elevator episode, he raised the incident with Judge Wenzel. (*See* Pl.'s Ex. F, Tr. July 20, 2010.) Judge Wenzel heard from Mr. Braswell and Marshals Rosario and Cornish. (*Id*.) Mr. Braswell complained that he was injured and needed to go to the hospital. (*Id*. 3:11-14.) Judge Wenzel ultimately found Mr. Braswell was physically well enough to proceed with the hearing, stating that the last time Mr. Braswell complained of an injury the court had sent him to the hospital only to get "the all clear from the medical personnel." (*Id*. 3:14-21.) Mr. Braswell informed Judge Wenzel that he had only been trying to defend himself in the elevator (*id.* 9:12-14), and that he wanted his handcuffs taken off so that he could "punch [Marshal Rosario] in his mouth." (Defs.' MSJ, Ex. 18, 11:4-5, 11:8-14.) Judge Wenzel stated that Mr. Braswell seemed "able to participate in a meaningful fashion" given that he was physically well enough to fight with the marshals, and that "I'm not going to disrupt this proceeding once again" by allowing

Mr. Braswell to go to the hospital. (Pl.'s Ex. F, 12:12-16, 12:19-20.) In response, Mr. Braswell

refused to participate in the proceedings, and Judge Wenzel eventually sent Mr. Braswell to the

court's observation room. (Defs.' MSJ, Ex. 18, 17-18.)

When Mr. Braswell returned to the Stamford Courthouse the next day for his criminal

trial, he informed Judge Wenzel that he wished to issue a complaint with the State Police against

Marshals Rosario and Cornish for the previous day's events. (Defs.' SOF ¶ 112.) Judge Wenzel

had the marshal service call the State Police and a trooper arrived. (*Id*. ¶ 113.) The trooper took a

written statement from Mr. Braswell and Supervisor Suda and viewed a videotape of the elevator

incident. (*Id*.) He concluded that

> It is clear, through the video, even without audio, that Braswell is
> both verbally and physically resisting their more than reasonable
> efforts to get him to, and into, the elevator. The Marshals showed
> great restraint as clearly described by Suda. The Marshals used no
> more effort than reasonable to get a physically and verbally
> abusive combative prisoner into an elevator for transport. The
> incident does not rise to the level of internal misconduct, as
> defined by the Marshal's use of force policy, let alone a criminal
> assault.

(Defs.' Ex. 19, at 3.) Mr. Braswell alleges that there is no evidence that the video the trooper

viewed is the same video the defendants have submitted with their Motion for Summary

Judgment,[3] and that before the trooper watched the video, Supervisor Suda supplied him with

false and prejudicial information about Mr. Braswell in an attempt to influence the trooper's

statement. (*See* Pl.'s Opp. to MSJ, at 8.)

In his deposition testimony, Mr. Braswell stated he has multiple injuries from the elevator

incident to his left knee, hip, and lower back, and that he continues to get treatment for them

---

[3] There appears to be evidence supporting Mr. Braswell's argument. *See* Pl.'s Ex. V (2013 follow-up report from State Trooper in which he states that marshals informed him the video he viewed on July 21, 2010 is no longer available).

through medication and shots in his lower back. (Pl.'s Ex. A, 106:5-6, 16-22.)

### C.  July 27, 2010

Mr. Braswell returned to the Stamford Courthouse on July 27, 2010 in conjunction with his criminal trial. (Pl.'s Ex. AA ¶ 63.) According to Mr. Braswell, one of the defendants, Marshal Norberto Caribe, confiscated Mr. Braswell's pill bottle upon arrival, which contained two types of pills. (*Id*. ¶¶ 64, 68.) Supervisor Suda directed Marshal Victor Davila to contact the Bridgeport Correctional Center ("BCC") infirmary to identify the pills. (Defs.' SOF ¶ 119.) Although Mr. Braswell argues the call records do not prove that anyone ever called BCC, one of the pills was correctly identified as regular strength Tylenol while the other remained unknown.[4] (Defs.' SOF ¶ 121; Pl.'s Ex. A, 129:16-18.) Because one of the pills remained unknown, the marshals did not return the medication to Mr. Braswell. (Defs.' SOF ¶ 121.)

The parties dispute what happened next. According to Mr. Braswell, he lay in his cell with his legs shackled because without his medication he felt too much pain to stand. (Pl.'s Ex. A, 125:7-8; Pl.'s Ex. AA ¶ 81.) Two marshals, defendants Troy Pivarnik and Victor Davila, came to his cell and informed Mr. Braswell that Judge Wenzel had ordered him to the courtroom. (Pl.'s Ex A, 124:20-25, 125:1-4.) Mr. Braswell responded that he wanted to see the head marshal for his pills before he got up. (*Id*. 125:2-3.) Marshals Davila and Pivarnik then left and returned with Chief Corley, Supervisor Birch, Supervisor Suda, and Lead Marshal Alvarado. (Pl.'s Ex. AA ¶ 75.) Mr. Braswell informed Chief Corley that he was in pain and needed his pills before he could go to court. (*Id*. ¶ 76.) Chief Corley responded that Judge Wenzel wanted Mr. Braswell in court. (Pl.'s Ex. A, 125:20-21.) Mr. Braswell refused, again requesting his medication. (*Id*. 125:22-23.) Without first ordering Mr. Braswell to sit up, Marshals Pivarnik and Davila lifted

---

[4] In his deposition testimony, Mr. Braswell stated that the unknown pill was for a treatment of a rash unrelated to the events in this case. (Pl.'s Ex. A, 17-19; *see also* Pl.'s Ex. AA ¶ 64.)

Mr. Braswell from the bunk, each holding one of his arms, while Supervisor Suda lifted his legs by the ankles and handcuffed him. (Pl.'s Ex. AA ¶¶ 82, 83; Pl.'s Ex. A, 132:1-4, 135:4-8.) Mr. Braswell stated he never resisted the marshals and did not stand up only because he was in so much pain. (Pl.'s Ex. A, 131:2-7, 135:9-12.) Supervisor Suda then "twisted" the handcuffs and the chain, causing pain to Mr. Braswell's ankles. (*Id.* 136:6-13; Pl.'s Ex. AA ¶ 86.) Mr. Braswell told Supervisor Suda he was in pain, but Supervisor Suda did not respond. (Pl.'s Ex. A, 138:19-25, 139:1-17.) Chief Corley stood by watching as Mr. Braswell continued to voice his pain and ask the marshals to stop hurting him. (*Id.* 142:6-20.) In response to Mr. Braswell's protests, the marshals just laughed. (*Id.* 142:25, 143:1-6.)

Supervisor Suda and Marshals Pivarnik and Davila then carried Mr. Braswell to the elevator while his body was arched in a "U" shape, causing Mr. Braswell pain in his lower back, shoulders, wrists, and ankles. (Pl.'s Ex. AA ¶ 85.) Once in the elevator, they dropped Mr. Braswell on the floor so that he fell approximately 1.5 feet to the ground as Supervisor Suda continued laughing. (*Id.* ¶ 87; Pl.'s Ex. A, 146:22-23.) They then carried him from the elevator to the courtroom and tried to make Mr. Braswell stand up, then sit down; Mr. Braswell could not do either because of the pain in his lower back, wrists, shoulders, and ankles. (Pl.'s Ex. AA ¶¶ 88-92.) When they tried to force him to sit, Mr. Braswell did not resist but positioned his body protectively to protect his left hip. (*Id.* ¶¶ 93, 96.) Eventually they "slammed" him into his seat, with Judge Wenzel observing from the bench. (Pl.'s Ex. A, 152:16-23.) At some point, Supervisor Suda stepped on Mr. Braswell's shackles, causing Mr. Braswell's ankle to bleed. (Pl.'s Ex. A, 160:3-20.) Mr. Braswell told Judge Wenzel he wanted to go to the hospital, but Judge Wenzel ignored his request and marshals removed Mr. Braswell to the observation room. (*Id.* 161:21-23, Pl.'s SOF ¶ 59.) Judge Wenzel then resumed the proceeding, stating:

> Now I guess I should note for the record that a few minutes ago I came out, I understand we were ready to open court and Mr. Braswell was – how should I put it – not ready to proceed. He appeared to be fighting with a couple of marshals and thereby being loud and disruptive. It did not appear to be a good time to open court, so we're back a few minutes later . . . At such point as he indicates he's willing to be good and not disruptive, we'll invite him to return.

(Defs.' Ex. 26, Tr. July 27, 2010, 2:3-21.)

As a result of the above incidents, Mr. Braswell alleges he has bruises on his wrists, gets steroid shots in his back for his pain, and has ongoing knee injuries. (Pl.'s Ex. A, 162:2-16, 172:12-24, 175:10-20.)

Again, Defendants offer a very different version of these events. They allege that the marshals arrived at Mr. Braswell's cell and gave him repeated orders to stand, which Mr. Braswell refused, letting his body go limp instead. (Defs.' SOF ¶¶ 128, 129.) Marshals Davila and Pivarnik informed Judge Wenzel of the situation, and the Judge "ordered inmate Braswell to court regardless." (Defs.' Exs. 21, 25.) Chief Corley calmly and repeatedly told Mr. Braswell that Judge Wenzel wanted him in the courtroom. (Defs.' Ex. 21.) In response, Mr. Braswell stated "I ain't going fucking nowhere without me taking my pills." (*Id*.) Supervisor Suda again ordered Mr. Braswell to stand up, and when Mr. Braswell continued to refuse, Supervisor Suda handcuffed him. (Defs.' SOF ¶ 130.) When Mr. Braswell ignored further orders to stand and walk, Supervisor Suda, along with Marshals Davila and Pivarnik, carried Mr. Braswell to the elevator; Mr. Braswell kept twisting his body while shouting obscenities. (*Id*. ¶¶ 131-133.) Once inside the elevator, they placed Mr. Braswell on the floor. (*Id*. ¶ 132; *see also* Defs.' Ex. 21.) Supervisor Suda continued to give Mr. Braswell verbal commands to stand up, but Mr. Braswell refused. (Defs.' Ex. 21.) They had to carry him in the same manner from the courtroom to the elevator because Mr. Braswell continued to resist and yell obscenities. (Defs.' SOF ¶ 134.)

Once in the courtroom, Mr. Braswell resisted sitting by trying to wiggle out of the chair, requiring Marshals Davila and Pivarnik to hold his arms to prevent him from sliding down. (*Id.* ¶¶ 135, 136.) Again, Supervisor Suda continued to order Mr. Braswell to sit and be compliant. (*Id.* ¶ 137.) When Judge Wenzel came out, Mr. Braswell stood and became more combative, trying to move his upper body to break free of the marshals and yelling "Get the fuck off me" and "Fuck you." (*Id.* ¶ 138; Defs.' Ex. 21.) Supervisor Suda and Marshal Davila then leaned Mr. Braswell over the defense counsel table for stability and to prevent him from hurting himself or others. (*Id.*) At no time did Mr. Braswell complain about an injury. (Defs.' SOF ¶ 139.) Because Mr. Braswell ignored Judge Wenzel's orders to calm down, Judge Wenzel ordered him out of the courtroom. (*Id.* ¶ 141.) When Mr. Braswell left the observation room at the end of the proceedings, he walked unassisted to his cell without complaining of any pain. (*Id.* ¶ 148.)

### III. Procedural History

Mr. Braswell is currently incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut. (Am. Compl. ¶ 1.) He filed his initial complaint *pro se*. The Court granted his subsequent motion to appoint counsel (ECF No. 22), after which Mr. Braswell filed his amended complaint. (ECF No. 30.) Count One alleges that under 42 U.S.C. § 1983,[5] the defendants violated his constitutional rights when they used excessive force against him on April 28, July 20, and July 27, 2010. Count Two alleges supervisory liability against defendants Chief Corley, Supervisor Birch, Lead Marshal Alvarado, and Supervisor Suda (the "Supervisory Defendants"). Defendants have moved for summary judgment as to both counts (ECF No. 56), to which Mr.

---

[5] 42 U.S.C. § 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects . . . any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Braswell filed his opposition. (ECF. No. 65).

## IV. Legal Standard

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## V. Excessive Force Claims

Mr. Braswell alleges that Defendants violated his due process rights under the Fourteenth Amendment, as applied through 42 U.S.C. § 1983, by subjecting him to excessive force. The parties do not dispute that Mr. Braswell was a pretrial detainee at all relevant times. "[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). In the Second Circuit, the same standard applies to excessive force claims whether brought by a pretrial detainee under the Fourteenth Amendment or by a convicted prisoner under the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Id*. at 48 ("[W]e conclude that the [Supreme Court's Eighth

14

Amendment] analysis is applicable to excessive force claims brought under the Fourteenth Amendment as well.").

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). The subjective element turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). It "requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quoting reference omitted). In making this determination, "it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

"The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8 (internal quotation marks omitted)). The court must determine whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (quoting reference omitted). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Id*. at 9. "This is not say that the 'absence of serious injury' is irrelevant to the Eighth Amendment injury." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). "[T]he extent of injury suffered by an

inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Hudson*, 503 U.S. at 7 (quoting reference omitted). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37. That said, because not "every malevolent touch by a prison guard gives rise to a federal cause of action . . . [t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting reference omitted). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38.

### A. No Reasonable Juror Could Find that Marshals Walker and Ferraro Used Excessive Force on April 28, 2010

Reviewing the record in the light most favorable to Mr. Braswell, the undisputed facts demonstrate that Marshals Walker and Ferraro did not use excessive force against Mr. Braswell on April 28, 2010.

Although Mr. Braswell has submitted an affidavit stating that he only resisted the marshals because of his pain, did not move about, and did not try to walk out of the courtroom (Pl.'s Ex. AA ¶¶ 19, 22), a plain reading of the transcript of the proceeding proves otherwise. The transcript shows Mr. Braswell was arguing with Judge Wenzel and blatantly disobeying his orders, in addition to repeatedly interrupting Judge Wenzel and informing him that he would not listen to anything that Judge Wenzel said. In addition, Mr. Braswell repeatedly and unambiguously stated to Judge Wenzel that he was leaving the courtroom in protest, to which Judge Wenzel continuously ordered Marshals Walker and Ferraro to hold Mr. Braswell in place

and not allow him to leave the courtroom until ordered otherwise. Given that the record consists of an official transcript that sets forth a clear version of this colloquy, I need not credit Mr. Braswell's version of this colloquy, because no reasonable juror could believe it. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that the lower courts erred in adopting the plaintiff's version of the facts when considering the defendant's motion for summary judgment because videotape evidence directly contradicted the plaintiff's testimony: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").[6]

This finding is further buttressed by Mr. Braswell's own testimony. In his deposition, Mr. Braswell conceded that he was turning to walk away from the defense table to leave the courtroom in direct contravention of Judge Wenzel's order to stay put. (Pl.'s Ex. A, 44:25, 45:1-5.) The marshals could have reasonably perceived Mr. Braswell's actions as not merely noncompliance but as a nascent security threat, under the circumstances: Mr. Braswell was continuously arguing with Judge Wenzel, disobeying his orders, and beginning to walk away.

---

[6] It is worth noting Judge Wenzel's comments that the marshals engaged in no wrongdoing. Judge Wenzel's statement that "I haven't seen any evidence to support [a claim of physical abuse by the marshals]" (Defs.' Ex. 27, Tr. Aug. 9, 2010, 41:7-8), arguably provides further support for this ruling. That statement arguably carries the most weight with respect to the April 28 incident, which occurred in his courtroom while he was on the bench. (*See also id.*, 41:1-3 ("There's no basis on which the court could make a finding that there's been any physical abuse of the defendant in this case.").) As such, that statement constitutes a finding of fact akin to a judge's finding of contumacious behavior in a summary contempt proceeding. *See Hardy v. Superior Court, Judicial Dist. Of Fairfield*, 305 Conn. 824 (2012) ("[When] contemptuous conduct is committed in the presence of the court, punishment may be announced summarily. . . . Under such circumstances, no witnesses are required in proof of the contempt, and the court has inherent power to impose punishment on its own knowledge and of its own motion without formal presentation or hearing of the person adjudged.") (quoting reference omitted). On appeal, such a finding would command deference by a reviewing court. *Banks v. Thomas*, 241 Conn. 569, 590 (1997) ("'[A] court exercises considerable discretion in dealing with contemptuous conduct occurring in its presence, and its summary adjudication is accorded a presumption of finality. . . . From necessity the court must be its own judge of contempts committed within its presence.") (quoting reference omitted). I can think of no reason why, in this non-appellate setting, I should not accord this finding the same deference. Because neither side has raised or briefed this issue, however, I decline to rely on Judge Wenzel's apparent factual finding as to what occurred before him on April 28 as a basis for this ruling.

(*See* Defs.' MSJ, Ex. 6, Tr. April 28, 2010, 23:23-25, 25:6 (Judge Wenzel stating, *inter alia*, "Hold him right there marshal. Okay? Sir, I choose when you get to leave the courtroom. Okay?" and "Sit [Mr. Braswell] down right there.").) In such a rapidly moving and escalating situation, I must afford considerable deference to the marshals' decisions as to how best to effectuate Judge Wenzel's orders. *Compare Whitley*, 475 U.S. at 321-22 ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.") (internal quoting reference omitted). Allowing Mr. Braswell to continue to prosecute an excessive force claim simply because his wrist was twisted while he was resisting the marshals' efforts to enforce Judge Wenzel's orders that he remain in the courtroom and be seated would impermissibly permit this Court and the jurors to second guess decisions made in the heat of the moment to maintain and restore order in the courtroom.

Given these circumstances, Mr. Braswell is unable to satisfy the subjective element of his excessive force claim. Mr. Braswell has not raised an issue of material fact as to whether the marshals applied force "in a good-faith effort to maintain or restore discipline"; the record is clear that the marshals did not apply such force "maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The undisputed evidence shows that Mr. Braswell openly and repeatedly defied Judge Wenzel's orders and continued to disrupt the court proceedings. Mr. Braswell's

continued resistance to Judge Wenzel's orders to remain in the courtroom, be seated, and keep quiet required Marshals Walker and Ferraro to apply some level of force to maintain and restore discipline in the courtroom. *See Cunningham v. Rodriguez*, No. 01-cv-1123, 2002 WL 31654960, at *6 (S.D.N.Y. Nov. 22, 2002) (finding that when pretrial detainee refused to comply with court and officers' orders and continuously spoke back to judge, "[i]n these circumstances, it is evident that the use of force was not wanton or malicious, but an authorized and good faith effort to restore discipline and gain control of a criminal defendant disrupting courtroom proceedings."). Mr. Braswell has not provided any evidence that the force the marshals used was "maliciously and sadistically for the very purpose of causing harm." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Indeed, the application of force ended as soon as the marshals removed Mr. Braswell from the proceeding he was disrupting. I therefore GRANT summary judgment as to this claim.

### B. Summary Judgment is Denied as to Marshal Rosario Because There is a Genuine Issue of Material Fact as to Whether He Used Excessive Force on July 20, 2010

As discussed above, the parties differ in their accounts of the events on July 20, 2010. A videotape of the incident suggests that neither party's account is entirely accurate. Although on a motion for summary judgment I must draw all inferences in Mr. Braswell's favor, I do not need to credit his version of events when it conflicts with videotape evidence of the events. *See Scott*, 550 U.S. at 380.

While the videotape provides limited angles and no audio, it clearly depicts the following facts. Marshal Rosario is seen standing outside Mr. Braswell's cell with his back to the camera. (Defs.' Ex. 17.) Mr. Braswell paces in his cell, but it is unclear whether either person is speaking, let alone yelling. (*Id.*) Eventually, Marshal Rosario puts handcuffs on Mr. Braswell while both of

them have their backs turned to the camera. (*Id.*) Mr. Braswell walks out of the cell while Marshal Rosario holds his right arm and points to the elevator; Marshal Cornish stands next to Marshal Rosario. (*Id.*) Mr. Braswell turns around and appears to be yelling at the marshals. (*Id.*) His hands remain down at all times. (*Id.*) Marshal Rosario pushes Mr. Braswell in the chest towards the elevator; Mr. Braswell does not fall and continues to walk backwards, facing the marshals. (*Id.*)

A second camera then shows Marshal Rosario pushing Mr. Braswell into the elevator. (*Id.*) Mr. Braswell is facing the marshals with his hands down and appears to be arguing. (*Id.*) Marshal Rosario again pushes Mr. Braswell, this time into the caged portion of the elevator, causing Mr. Braswell's left shoulder to hit the wall. (*Id.*) Marshal Rosario then grabs Mr. Braswell's right shoulder, close to his neck, and can be seen yelling inches from Mr. Braswell's face. (*Id.*) Because Mr. Braswell's back is to the camera at this point, it is unclear whether Mr. Braswell is yelling also. (*Id.*) Marshal Rosario again pushes Mr. Braswell against the caged portion of the wall, this time with two hands. (*Id.*) Marshal Cornish then slides the door of the cage closed, separating the two marshals from Mr. Braswell. (*Id.*) Due to the camera angle, it is unclear whether Mr. Braswell kicks his foot out during this time. (*Id.*) With the door closed, Marshal Rosario reaches for his belt and appears to be still yelling at Mr. Braswell. (*Id.*) Shortly thereafter other marshals run into the elevator, with Chief Corley stepping between Marshal Rosario and Mr. Braswell. (*Id.*) Chief Corley puts his hands on Marshal Rosario's shoulders to move him out of the elevator, then slides open the cage door to attend to Mr. Braswell. (*Id.*)

The video does not support Mr. Braswell's claim that he fell to the floor or got pushed with such force that his stomach was almost parallel to the floor. (*See* Pl.'s Ex. A, 79:5-13, 86:25, 89:1-13.) Yet it is also unclear whether, as Marshal Rosario claims, he used only a

"desensitizing touch" when Mr. Braswell would not walk, or that he pushed Mr. Braswell in the elevator in response to Mr. Braswell's attempt to kick him and escape the cage. (*See* Defs.' MSJ, Ex. 16.) The video also leaves open a question of material fact as to how much force Marshal Rosario used in handcuffing Mr. Braswell, or what the parties were yelling to each other.

While it is a close question, I find that these issues of material fact would allow a reasonable juror to determine that Mr. Braswell has satisfied the subjective prong of his excessive force claim. I therefore cannot conclude, as a matter of law, that Marshal Rosario's use of force was "applied in a good-faith effort to maintain or restore discipline," and not "maliciously or sadistically to cause harm." *Hudson*, 503 U.S. at 7. Without knowing what Mr. Braswell was yelling at Marshal Rosario or whether he did in fact try to kick Marshal Rosario and escape the cage, I cannot determine the type of threat Marshal Rosario believed Mr. Braswell posed. As such, I also cannot "evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id*.

For instance, a fact-finder could reasonably determine that although Mr. Braswell was arguing with Marshal Rosario, he at no point threatened the marshals or tried to kick Marshal Rosario and escape the cage. The fact-finder could then conclude that these facts, coupled with Marshal Rosario's yelling at Mr. Braswell and threatening him with mace, show that Marshal Rosario was not acting in a good-faith effort to maintain or restore discipline when he applied force against Mr. Braswell. *See Ortiz v. Cornacchia*, 88-cv-5988, 1990 WL 103982, at *2 (S.D.N.Y. July 16, 1990) (denying summary judgment where prisoner claimed he was assaulted without justification and officers contended that their actions were prompted by prisoner's failure

to follow directions in elevator; while videotape evidence showed inmate was arguing with officers, "[a]lthough such conduct may possibly have violated some rule of order in the prison, [the officers] have not offered this as a justification for their actions. Therefore, there is a material issue of fact as to whether the physical force was reasonably used in an effort to maintain order."); *see also Cole v. Fischer*, 379 Fed. Appx. 40, 42 (2d Cir. 2010) (summary order) (finding district court could have inferred defendant's use of force was malicious when defendant, while striking plaintiff in the face, "simultaneously made racially and religiously derogatory remarks to the plaintiff.").

A fact-finder could also conclude that Mr. Braswell has satisfied the objective prong of his excessive force claim, in that the harm done violated contemporary standards of decency. Because whenever "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident," if a fact-finder concluded that Marshal Rosario did not act in a good-faith effort to maintain or restore discipline, he or she would inevitably determine that Marshal Rosario had also violated contemporary standards of decency. *Hudson*, 503 U.S. at 8.

To be sure, Mr. Braswell may have an uphill battle at trial proving his injuries. In his deposition testimony, he stated that as a result of the July 20, 2010 incident, he has injuries to his left knee, hip, and lower back, and that he still receives treatment for these injuries through medication and shots in his lower back. (Pl.'s Ex. A, 106:5-6, 16-22.) However, the medical records he submits are mainly from two and three years after the incident, and the video does not suggest he suffered any grievous harm. (*See, e.g.*, Pl.'s Ex. EE.) Still, there is enough in the record about these injuries to require the Court to let a jury to decide whether they stem from July 20, 2010. *See Cornacchia*, 1990 WL 103982, at *4 ("Although [the plaintiff] may ultimately

22

have difficulty persuading the ultimate trier of fact, the court must, for purposes of this motion, accept his allegations [as to injury] true."). Mr. Braswell has sufficiently raised a genuine issue of material fact as to whether Marshal Rosario used excessive force against him to warrant denial of summary judgment.

### 1. Summary Judgment is Granted to Marshal Cornish Because the Record Does Not Support his Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In the amended complaint, Mr. Braswell states when Marshals Rosario and Cornish arrived at his cell on July 20, 2010, "[t]hey used excessive force when handcuffing the Plaintiff's hands behind his back." (Am. Compl. ¶ 34.) The evidence in the record, however, shows only that Marshal Rosario handcuffed Mr. Braswell, not Marshal Cornish. Mr. Braswell raises no additional allegations of force by Marshal Cornish in his opposition to summary judgment. Mr. Braswell has therefore not raised a question of material fact as to whether Marshal Cornish was personally involved in the alleged use of excessive force.

In addition, while an officer may be liable for failure to intervene, Mr. Braswell has not raised this theory of liability as to Marshal Cornish in either his Amended Complaint or his summary judgment briefing. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."). Instead, Mr. Braswell only argues, in broad terms and without any supporting evidence, that Marshal Cornish applied excessive force. Mr. Braswell's omission of any failure to intervene claim against Marshal Cornish appears to reflect a deliberate choice given that he makes such claims against the

Supervisory Defendants. Because he has not pled this theory of liability against Marshal Cornish, however, I will not address it.

There is no evidence that Marshal Cornish applied excessive force against Mr. Braswell on July 20, 2010, and I GRANT him summary judgment.

### 2. Mr. Braswell Has Not Produced Evidence to Support a Claim of Supervisory Liability as to Chief Corley With Regard to April 28, 2010 or July 20, 2010

Mr. Braswell brings a claim of supervisory liability against Chief Corley for the events on July 20, 2010. (Am. Compl. ¶¶ 68, 69.)  "Supervisory liability is a concept distinct from municipal liability, and is 'imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.'" *Odom v. Matteo*, 772 F. Supp. 2d 377, 403 (D. Conn. 2011) (quoting *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987)). "The rule in this circuit is that when monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995).[7]

Mr. Braswell appears to be alleging that Chief Corley is liable under the second prong when he argues that "[d]espite his knowledge of the July 20, 2010 incident, Chief Marshal Corley failed to remedy the actions of his subordinate marshals when the Plaintiff complained to him on July 21, 2010 of repeated instances of certain Defendants using excessive force against the Plaintiff." (Am. Compl. ¶ 69.) However, the evidence in the record shows that the marshals facilitated a full investigation after Mr. Braswell complained about the July 20, 2010 events.

In particular, the undisputed evidence shows that Chief Corley directed Mr. Braswell to the courtroom after Mr. Braswell complained of an injury, and Mr. Braswell was fully able to—and did—raise his alleged injury with Judge Wenzel in court. (*See* Pl.'s Ex. F, Tr. July 20, 2010.) Judge Wenzel ultimately determined that Mr. Braswell was physically well enough to continue with the proceedings and denied his request to go to a hospital again, noting that Mr. Braswell's previous trip to the hospital on April 28, 2010 had resulted in an "all clear" from medical personnel. (*Id*. 3:14-21.) In addition, the next day in court Mr. Braswell stated that he would like to issue a complaint with the State Police against the marshals regarding the July 20 events. (Defs.' SOF ¶ 112.) As detailed above, Judge Wenzel ordered the marshals to contact State Police immediately, and a state trooper arrived. (*Id*. ¶ 113.) The trooper conducted an investigation of the elevator incident and concluded in unambiguous terms that the marshals at issue had acted reasonably. (Defs.' Ex. 19, at 3.)

Given this undisputed evidence, Mr. Braswell cannot succeed on his supervisory liability claim against Chief Corley by arguing that after Mr. Braswell informed him of the elevator incident, Chief Corley failed to remedy the wrong. After hearing Mr. Braswell complain of an

---

[7] Although the Supreme Court may have narrowed or abrogated some of the *Colon* predicates for supervisory liability, *see Ashcroft v. Iqbal*, 556 U.S. 662 (2009), I need not determine the extent to which the *Colon* predicates survive because Mr. Braswell does not proffer sufficient evidence to satisfy any of them.

injury, Chief Corley directed Mr. Braswell to Judge Wenzel; Mr. Braswell then repeatedly voiced his injuries, resulting in a full investigation. To allow liability against Chief Corley in such circumstances would stretch the concept of supervisory liability much too far.[8] *See Toliver v. City of New York*, 10-cv-5803(LTS), 2012 U.S. Dist. LEXIS 171239, at *17 (S.D.N.Y. Dec. 3, 2012) (finding no supervisory liability where defendant directed plaintiff to prisoner grievance procedures after plaintiff complained of excessive force).

Similarly, Mr. Braswell cannot successfully claim that Chief Corley is subject to supervisory liability for "ignor[ing] a letter Mr. Braswell wrote to the Judicial Marshal Service after the April 28 incident, complaining that Marshals Ferraro and Walker had hurt him" because Mr. Braswell does not allege that either Marshal Ferraro or Marshal Walker was involved in the July 20, 2010 or any later events. (Pl.'s Opp. to MSJ, at 29; *see also* Pl.'s Ex. U.) It is not plausible that Chief Corley should have somehow foreseen and prevented the actions of Marshal Rosario when there is no evidence that Chief Corley had any notice that Marshal Rosario would act as he did. *See Johnson*, 481 F.2d at 1034 (affirming dismissal as to defendant warden where the excessive force complained of was "a single spontaneous incident, unforeseen and unforeseeable by higher authority.").

Finally, to the extent Mr. Braswell argues that Chief Corley failed to intervene on July 20, 2010 (*see* Pl.'s Opp. to MSJ, at 29), his argument fails. First, as Mr. Braswell himself concedes, Chief Corley entered the elevator "in which Marshal Rosario was physically attacking the Plaintiff and restrained [Marshal Rosario] from further hurting the Plaintiff." (Am. Compl. ¶

---

[8] In his Amended Complaint, Mr. Braswell brought his supervisory liability claim against Supervisor Suda for "non-verbally intimidating the Plaintiff in an effort to prevent him from completing the police report." (Am. Compl. ¶ 71.) Defendants briefed and refuted this basis for liability in their Motion for Summary Judgment (*see* Defs.' MSJ, at 3) but Mr. Braswell did not respond to it in his discussion of supervisory liability. I therefore find Mr. Braswell has abandoned this claim. *See Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

68.) There is no evidence Chief Corley participated in or even knew of Marshal Rosario's actions before he entered the elevator. Further, when Chief Corley did see what was happening, the videotape evidence shows he immediately interceded on Mr. Braswell's behalf by separating the parties and physically removing Marshal Rosario from the elevator. (Defs.' Ex. 17); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring."). For these reasons, I GRANT summary judgment to Chief Corley as to the July 20, 2010 incident.

### C. There is a Genuine Issue of Material Fact as to whether Supervisor Suda and Marshals Pivarnik and Davila Used Excessive Force on July 27, 2010

Construing the record in the light most favorable to Mr. Braswell, I find that he has raised a genuine issue of material fact as to whether Supervisor Suda and Marshals Pivarnik and Davila used excessive force against him on July 27, 2010. First, a reasonable juror could credit Mr. Braswell's testimony and determine that he has satisfied the subjective element of his excessive force claim by showing the marshals acted with the necessary level of culpability. In particular, a fact-finder could determine any of the following allegations by Mr. Braswell to be true: that Supervisor Suda continuously twisted Mr. Braswell's handcuffs and shackles (Pl.'s Ex. A, 136:6-13; Pl.'s Ex. AA ¶ 86); that Mr. Braswell repeatedly told Supervisor Suda and Marshals Pivarnik and Davila that the way they were causing him pain, but they ignored it (Pl.'s Ex. A, 142:6-20); that Mr. Braswell did not resist the marshals in his cell and informed them that he could not move only because of his pain (*Id.* 131:2-7, 135:9-12); that Chief Corley, Supervisor Birch, and Lead Marshal Alvarado stood in Mr. Braswell's cell watching these events without interceding (Pl.'s Ex. AA ¶ 75, Pl.'s Ex. A, 142:17-24); that the marshals laughed at Mr. Braswell when he complained of injury (Pl.'s Ex. A, 142:25, 143:1-6); that Supervisor Suda laughed when he dropped Mr. Braswell in the elevator (Pl.'s Ex. AA ¶ 87; Pl.'s Ex. A, 146:22-23); and that

Supervisor Suda stepped on Mr. Braswell's shackles in the courtroom. (Pl.'s Ex. A, 160:3-20.) If a fact-finder were to credit any of this, he or she could reasonably conclude that Supervisor Suda and Marshals Pivarnik and Davila applied force "maliciously and sadistically to cause harm," thereby satisfying the subjective component of the excessive force claim.

A reasonable juror could also find that Mr. Braswell satisfied the objective component of his claim, in that the harm against him violated contemporary standards of decency because Supervisor Suda and Marshals Pivarnik and Davila used force maliciously and sadistically to cause harm. As with his July 20, 2010 claim, however, Mr. Braswell's claim of resulting injury is tenuous. A jury will ultimately have to decide whether to credit Mr. Braswell's allegations that the injuries he has suffered resulted from this incident, and whether Mr. Braswell's allegations as to the amount of force applied against him is credible. Nonetheless, for purposes of this motion, Mr. Braswell has alleged more than a *de minimis* use of force such that his resulting injury, even if not significant, is sufficient to violate contemporary standards of decency and survive summary judgment.

### 1. Summary Judgment is Denied as to Chief Corley, Supervisor Birch, and Lead Marshal Alvarado for Their Failure to Intervene

Mr. Braswell also argues that summary judgment should be denied as to defendants Chief Corley, Supervisor Birch, and Lead Marshal Alvarado because there is a genuine issue of material fact as to whether they are liable for failing to intervene. I agree.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *O'Neill*, 839 F.3d at 11. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could

not possibly conclude otherwise." *Id.* "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 552.

Construing the record in the light most favorable to Mr. Braswell, I find that a reasonable juror could determine that Chief Corley, Lead Marshal Alvarado, and Supervisor Birch were present in Mr. Braswell's cell and did not intervene despite having an opportunity to do so. First, a juror could accept Mr. Braswell's testimony that all three of these defendants were in his cell while Supervisor Suda and Marshals Pivarnik and Davila used excessive force against him. (Pl.'s Ex. AA ¶ 75.) A juror could then find that the events in the cell occurred as Mr. Braswell has alleged, such that Chief Corley, Lead Marshal Alvarado, and Supervisor Birch stood by laughing as Mr. Braswell repeatedly cried out in pain despite their opportunity to prevent the harm the other marshals were inflicting. *Contrast O'Neill*, 839 F.2d at 11-12 (finding no liability for failure to intervene when officer struck plaintiff with three quick successive blows because "[t]his was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator."). Although there are a number of credibility issues to resolve before finding such liability, it is for a fact-finder, not this Court, to make those determinations. I therefore DENY summary judgment as to this claim against Chief Corley, Lead Marshal Alvarado, and Supervisor Birch.

### 2. Summary Judgment is GRANTED as to Marshals Caribe and Martinez Because the Record Does Not Support Their Involvement

Mr. Braswell's only allegation against Marshal Caribe is that he confiscated Mr. Braswell's medicine.[9] (Am. Compl. ¶ 46.) Nowhere does Mr. Braswell argue that Marshal Caribe was involved in applying excessive force against him, or that Marshal Caribe, despite

---

[9] Mr. Braswell does not claim that Marshal Caribe—or any of the Defendants—was deliberately indifferent to Mr. Braswell's medical needs. (*See* Pl.'s Opp. to MSJ, at 3 n.1.)

having the opportunity to intervene when the other marshals applied excessive force, did not. Thus, because Mr. Braswell has not provided any evidence to raise a genuine issue of material fact as to whether Marshal Caribe applied excessive force or failed to intervene, I GRANT summary judgment to Marshal Caribe. *See Wright*, 21 F.3d at 501.

For the same reasons, I GRANT summary judgment as to Marshal Martinez. In his Amended Complaint, Mr. Braswell alleged that Marshal Martinez was one of the defendants who arrived at his cell on July 27, 2010. (Am. Compl. ¶ 53.) However, Mr. Braswell drops this allegation in his Opposition to the Motion for Summary Judgment and argues only that Marshal Martinez verbally taunted him after marshals escorted Mr. Braswell out of the courtroom once the proceeding had ended on July 27. (Pl.'s SOF ¶ 51.) Such conduct, without more, is not unconstitutional excessive force. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (holding that name-calling without "any appreciable injury" did not violate inmate's constitutional rights). I therefore GRANT summary judgment as to Marshal Martinez.

## VI. Quasi-Judicial Immunity

Defendants argue that Supervisor Suda and Marshals Davila and Pivarnik are entitled to quasi-judicial immunity for the events on July 27, 2010. (*See* Defs.' MSJ, at 23.)[10] I disagree.

Generally, law enforcement officers are entitled to qualified, not absolute, immunity for conduct undertaken in their official duties. *See Malley v. Briggs*, 475 U.S. 335, 340 ("Our cases also make plain that '[f]or executive officers in general, . . . qualified immunity represents the norm.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). Judges, however, enjoy absolute immunity. *Forrester v. White*, 484 U.S. 219, 225 (1988) ("As a class, judges have long

---

[10] Specifically, Defendants argue that quasi-judicial immunity applies to "the actions of Suda, Davilia and Pivarnik on July 27, 2010 when they were ordered by the Judge to bring the plaintiff to the courtroom and he refused to walk and so they carried him, and when they were ordered by the Judge in the courtroom to control the plaintiff and when they were unsuccessful, to remove him to the observation room." (Defs.' MSJ, at 23.)

enjoyed a comparatively sweeping form of immunity[.]"). Defendants argue that I should extend this judicial immunity to the actions taken by Supervisor Suda and Marshals Davila and Pivarnik on July 27, 2010 because they undertook those actions in response to Judge Wenzel's order.[11]

"[A]bsolute immunity is 'of a rare and exceptional character.'" *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir. 1986) (quoting *Cleavinger v. Saxner*, 474 U.S. 193 (1985)). In determining whether absolute immunity applies, the Supreme Court directs courts to employ a "functional" approach. "Running through our cases, with fair consistency, is a 'functional' approach to immunity questions other than those that have been decided by express constitutional or statutory enactment. Under that approach, we examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224. Because absolute judicial immunity is often "essential to safeguarding the integrity of the judicial process," it sometimes "extends to those performing functions closely associated with that process." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995). Yet "qualified immunity is presumed to be sufficient to protect public officials in the exercise of their discretionary duties [and] absolute immunity extends only so far as necessary to protect the judicial process." *Id.* (internal quoting reference omitted). The Supreme Court has made clear that it has "recognized a category of 'qualified' immunity that avoids unnecessarily extending the scope of the traditional concept of absolute immunity." *Forrester*, 484 U.S. at 224.

The Supreme Court and the Second Circuit have yet to address whether a marshal or other court security officer who applies force while responding to a judge's order is protected by quasi-judicial immunity. Other circuit courts addressing this issue are split. Defendants argue I

---

[11] Defendants make no such argument as to Marshals Rosario and Cornish's actions on July 20, 2010.

should follow the Eighth Circuit's approach, in which the court extended quasi-judicial immunity to the officer's in-court actions. *See Martin v. Hendren*, 127 F.3d 720 (8th Cir. 1997). In *Hendren*, the Eighth Circuit held that a police officer was entitled to absolute quasi-judicial immunity when he restrained the plaintiff by order of the judge. *Id*. at 721. The court reasoned that although the plaintiff alleged the officer improperly used excessive force, the officer's act of restraining the plaintiff was protected by quasi-judicial immunity because it was undertaken in response to the judge's order. *Id*.

Despite the Eighth Circuit's decision, I find persuasive the reasoning of the Seventh and Tenth Circuits, both of which have reached the conclusion that absolute immunity should not be extended so broadly. *Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001); *Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402 (10th Cir. 1990). In sum, these courts reasoned that absolute immunity may apply when the conduct the plaintiff challenges is that specifically directed by the judge— not when the conduct being challenged is the *manner* in which the judge's order is being carried out.

In *Richman*, the Seventh Circuit discussed at length the limited circumstances in which courts have applied the Supreme Court's "functional approach" when extending absolute immunity. *Richman*, 270 F.3d at 435. With this background, the Seventh Circuit found that the Eighth Circuit in *Hendren* had "confused the question [of] . . . whether the challenged conduct was specifically ordered by the judge—with the separate question of whether the conduct was lawful or exceeded the actor's authority." *Id*. at 436. The Eighth Circuit, the *Richman* court continued, had applied the Supreme Court's *Mireles* decision too broadly:

> In *Mireles* [*Mireles v. Waco*, 502 U.S. 9 (1991)]*, the plaintiff challenged the judge's order directly—that is, by suing the judge. *Mireles* holds that when the challenged conduct is the judge's own decision making, the applicability of absolute immunity cannot

> turn on the correctness of the judge's decision. 502 U.S. at 12–13, 112 S.Ct. 28. By contrast, when the conduct directly challenged is not the judge's decision making, but the manner in which that decision is enforced, we agree with the Tenth Circuit [in *Martin v. Board of County Commissioners*] that the law enforcement officer's fidelity to the specific orders of the judge marks the boundary for labeling the act "quasi-judicial." *See Martin,* 909 F.2d at 404–05.

*Id*. The court continued that "[o]ur quasi-judicial immunity cases demonstrate that the primary function to be protected is judicial or quasi-judicial decision making." *Id*. (collecting cases). However, "for court personnel and adjuncts who do not exercise a discretionary function comparable to a judge's, the justification for extending absolute immunity is most compelling when the lawsuit challenges conduct specifically directed by the judge, and not simply the manner in which the judge's directive was carried out." *Id*. at 437 (collecting cases).

Similarly, the Tenth Circuit rejected the defendants' quasi-judicial immunity argument because there was no basis to hold "that peace officers are absolutely immune from liability for the *manner* in which they carry out otherwise proper court orders":

> To the contrary, a judicial warrant contains an implicit directive that the arrest and subsequent detention be carried out in a lawful manner. Insofar as defendants exceeded legal bounds in executing the warrant for arrest, defendants have *a fortiori* violated the very judicial order under which they seek the shelter of absolute immunity.

*Board of Cnty. Comm'rs*, 909 F.2d at 405.

In the present case, Mr. Braswell is not challenging Judge Wenzel's orders to bring him to the courtroom or arguing that Judge Wenzel ordered the Defendants to apply excessive force. Instead, Mr. Braswell is challenging the *manner* in which the Defendants carried out Judge Wenzel's orders by arguing that it resulted in excessive force. His allegations focus on conduct that occurred outside the courtroom, including Marshal Rosario's applying force against him in

the elevator, and the marshals' twisting his handcuffs while laughing at him, dropping him in an elevator, and ignoring his repeated cries for help even when he was not resisting them. Because "[t]he policies articulated in our quasi-judicial immunity cases have less force when, as in this case, the challenged conduct is the manner in which the judge's order is carried out, and not conduct specifically directed by a judge," *Richman*, 270 F.3d at 437, Defendants are not entitled to quasi-judicial immunity. *See id*. at 438 ("[T]he deputies are not being called upon to answer for wrongdoing directed by the judge, but instead for their own conduct. And that conduct—the manner in which they enforced the judge's order—implicates an executive, not judicial, function."); *Board of Cnty. Comm'rs*, 909 F.2d at 405 ("We conclude that absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its execution.").

In reaching this decision, I by no means intend to devalue the important and difficult function judicial marshals perform in transporting detainees to the courtroom. Yet "this function is adequately protected by immunizing a judge's order to restrain a person, *see Mireles,* 502 U.S. at 12–13, 112 S.Ct. 286, and by barring lawsuits that challenge a judge's decision through claims aimed at officers who do nothing more than implement it." *Richman*, 270 F.3d at 438. "It is not necessary to the judicial function, in our judgment, to also deny a remedy to plaintiffs who were harmed not by the judge's order, but by unlawful conduct by those who enforce it." *Id*. at 439. For these reasons, I DENY Defendants' claim to quasi-judicial immunity.

### VII. Qualified Immunity

Qualified immunity insulates government officials from personal liability when they perform discretionary duties "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457

U.S. at 818. "A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law, *see, e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998); or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred, *see, e.g., Harlow,* 457 U.S. at 817–19; or (3) if the defendant's action was 'objective[ly] legal[ly] reasonable[ ] . . . in light of the legal rules that were clearly established at the time it was taken.'" *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (full internal quoting references omitted).

I have already determined that a reasonable juror could find that certain marshals violated Mr. Braswell's constitutional rights by applying excessive force against him or by failing to intervene on July 20, 2010 and July 27, 2010. I must next determine whether Mr. Braswell's rights to be free of excessive force and to have officers intervene when such force is being applied were clearly established when these events took place. A right is considered "clearly established" if it is established by "the decisional law of the Supreme Court or the appropriate circuit court"—here, the Second Circuit. *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989). Neither party disputes that the right to be free of excessive force was well-established long before the events at issue here took place, *see, e.g.*, *Hudson*, 503 U.S. 1, that this right extends to pretrial prisoners under the Due Process Clause, *Walsh*, 194 F.3d at 47, or that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other officers in their presence. *O'Neill*, 839 F.3d at 11.

The only remaining question is whether the actions of the marshals at issue were objectively reasonable at the time they were taken. If a fact-finder were to credit Mr. Braswell's allegations, he or she would conclude that not all of the marshals' conduct was objectively

reasonable. Mr. Braswell's allegations include assertions that the marshals twisted his handcuffs even when he was not resisting, causing bruising and bleeding on Mr. Braswell's wrist and ankle; that the marshals laughed at him while he cried out in pain, carried him in a knowingly painful manner, and dropped him in the elevator; and that Marshal Rosario applied force against him in the elevator not out of need to maintain order or discipline. Such conduct, if credited, would not be objectively reasonable. Accordingly, I must deny summary judgment on qualified immunity grounds until a fact-finder can resolve the underlying factual issues and determine whether the marshals' actions were objectively reasonable given the threat they reasonably believed Mr. Braswell posed. *See Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999) ("[Plaintiff] and the officers disputed material facts that implicate the reasonableness of the officers' use of force . . . Because the district court could not determine whether the officers reasonably believed that their force was not excessive when several material facts were still in dispute, summary judgment on the basis of qualified immunity was precluded.").

## VIII.   Conclusion

For the reasons above, I GRANT in part and DENY in part Defendants' Motion for Summary Judgment. Specifically, I grant summary judgment as to defendants Caribe, Cornish, and Martinez and deny summary judgment as to the remaining defendants. I also GRANT both parties' motions to amend/correct their summary judgment pleadings.

IT IS SO ORDERED.


_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:        Hartford, Connecticut
              February 11, 2015

36